# In the United States Court of Federal Claims

No. 17-1138C
(Filed: August 20, 2018)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| SUMMIT POWER GROUP, LLC, and CCM TCEP, LLC, | Contracts; declaratory judgment; 28 U.S.C. § 1491(a)(1) (2012); guaranty agreement; debt cancellation; cooperative agreement. |
| *Plaintiffs*, | |
| v. | |
| THE UNITED STATES, | |
| *Defendant*. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Stanley R. Soya*, Washington, DC, with whom was *Ellen M. Lynch* for plaintiffs.

*Adam E. Lyons*, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, for defendant.

## OPINION

BRUGGINK, *Judge*.

The United States, acting through the Department of Energy's National Energy Technology Laboratory ("DOE"), entered into Cooperative Agreement DE-FE0002650 with Summit Texas Clean Energy, LLC ("STCE") on January 29, 2010. Plaintiffs, Summit Power Group, LLC and CCM TCEP, LLC ("SPG" and "CCM," collectively "the guarantors") guaranteed $13.8 million that DOE paid to STCE under the cooperative agreement. After DOE terminated the cooperative agreement, plaintiffs sued, seeking a declaration that they have no obligation to pay DOE the guaranteed sum because either DOE has not met the conditions stated in their payment agreements or DOE

materially breached the implied duty of good faith and fair dealing, precluding DOE from terminating for STCE's failure to reach financial close.

Pending is defendant's motion to dismiss plaintiffs' amended complaint for lack of subject-matter jurisdiction or failure to state a claim. The motion is fully briefed and we held oral argument on August 9, 2018. Because the remedy that plaintiffs seek is purely declaratory, lacking any claim for actual, presently due money damages from the United States, we grant defendant's motion to dismiss for lack of subject-matter jurisdiction.

## BACKGROUND

The United States, acting through DOE, established the Clean Coal Power Initiative in 2002 with the objective of promoting investment in efficient, environmentally-friendly coal power projects.[1] In furtherance of this initiative, DOE entered into Cooperative Agreement DE-FE0002650 with STCE on January 29, 2010. By constructing and operating the Texas Clean Energy Project ("TCEP"), STCE hoped to integrate a commercial electric power plant with carbon dioxide capture and sequestration. DOE agreed to provide financial support as well as oversight and collaboration in the process of designing and constructing the TCEP.

The project would proceed in four phases: project definition, design, construction, and demonstration. STCE and DOE were to share all costs incurred on an "'as-expended', dollar-for-dollar basis" by applying the cost share ratios in the cooperative agreement. Def.'s Mot. to Dismiss App. 14. DOE was not obligated to provide funding beyond its cost share and had sole discretion to decide the availability of funds, whether STCE had made substantial progress, and whether continuing the agreement was advantageous to DOE. At the conclusion of each phase, the cooperative agreement obligated STCE to submit to DOE a Decision Point Application that demonstrated progress, provided a budget for the next phase, and described next steps in the project. If DOE did not approve the Decision Point Application, DOE's

---

[1] The Energy Policy Act of 2005, Pub. L. No. 109–58 § 401–405, 119 Stat. 749–753 (2005) (codified at 42 U.S.C. § 15961–15965 (2012)), and the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111–5, 123 Stat. 115 (2009) set forth technical requirements and funded the Clean Coal Power Initiative.

maximum liability was the funding approved for the current phase. DOE also reserved the right to retain funds approved for a phase in the event that STCE failed to meet certain milestones.

The parties projected that the total project cost would be $1.72 billion; DOE initially anticipated its contribution would be $350 million but later increased that figure to $450 million. At the outset, DOE obligated $215 million for the project. Only $15 million was "available for work performed by [STCE] during Phase I of the Project . . . . The remainder of these funds [$200 million] will be available contingent upon the submission by [STCE] of a Decision Point Application and written approval of the Decision Point Application by the DOE Contracting Officer." *Id.* at 20.

Phase 1 began February 1, 2010, and was set to conclude December 31, 2010. During Phase 1, STCE was to secure commitments from investors and lenders to provide all non-federal funding needed to construct the TCEP. STCE would match DOE's $15 million contribution to Phase 1. STCE did not secure the necessary funding by the deadline, however. Instead, DOE repeatedly extended Phase 1, divided Phase 1 into a series of four sub-phases, and provided accelerated payments to assist STCE in securing financing.

To receive accelerated payments, STCE agreed to a modified cost sharing provision. DOE agreed to reimburse STCE at a higher rate in Phase 1 in exchange for reimbursing STCE at a lower rate during later phases. STCE agreed that it was "liable for the percentage of total allowable project costs . . . even if the project is terminated early or is not funded to completion." Pls.' Am. Compl. App. Ex. 4 at 4. If STCE did not achieve its applicable cost share by the time of project termination or discontinuance, it agreed to "refund sufficient funds to DOE in order to achieve its required cost share of total project costs accrued at the point of the project's termination or discontinuance." *Id.* STCE and DOE also modified the cooperative agreement to provide "that DOE may, at its discretion, allow [STCE] to invoice the DOE at an accelerated rate of up to 80% of the total allowable costs on an invoice-by-invoice basis from the time of award until all . . . funds obligated to this award ($211,097,445) have been expended." Pls.' Ex. 5 at 5.

DOE requested that STCE provide security for some of the accelerated payments. On February 15, 2012, Modification 14 "recognize[d] and incorporate[d] certain tranches of security" for a portion of $16.2 million in accelerated payments to STCE. Pls.' Ex. 2 at 3. SPG guaranteed $6.8 million of the $16.2 million. Assuming STCE had insufficient funds, SPG would be

3

required to repay DOE if the cooperative agreement was "terminated by STCE; terminated by DOE for material noncompliance; discontinued by STCE; or discontinued by DOE pursuant to the Decision Point Application process for failure to achieve the technical objectives for Phase 1." *Id.* at 5. SPG would pay a portion of the guaranteed amount immediately and the rest in installment payments.

Modification 15 incorporated into the cooperative agreement CCM's payment agreement as well as an amended payment agreement increasing SPG's guaranty by $1 million. CCM agreed to deposit $6 million in a segregated deposit account, which it would maintain in the event that STCE was obligated to repay the accelerated payment and failed to do so. If STCE failed to repay, CCM would release to DOE the $6 million if STCE terminated or discontinued the cooperative agreement or if DOE terminated the agreement for material noncompliance or discontinued the agreement pursuant to the Decision Point Application Process for failure to achieve the technical objectives of Phase 1. In sum, SPG guaranteed STCE's repayment up to $7.8 million and CCM guaranteed up to $6 million, totaling $13.8 million.

By December 2015, DOE had provided STCE with $117.9 million for Phase 1, more than one hundred million in excess of its original commitment to Phase 1. In late 2015, STCE requested additional funding to complete Phase 1. Although DOE agreed to accelerate a portion of those funds and to extend the Phase 1 deadline, in February 2016 DOE reported its proposed budget to Congress, stating its intention to defund any Clean Coal Power Initiative projects that had not reached financial close, including the TCEP. STCE did not reach financial close by the conclusion of the cooperative agreement extension, July 14, 2016. Instead, STCE submitted a request for informal dispute resolution to DOE. After a period of informal dispute resolution, on August 23, 2016, DOE informed STCE by letter that DOE had "decided to discontinue the cooperative agreement to STCE pursuant to the Decision Point Application Process for failure to achieve the technical objectives for phase 1." Pls.' Ex. 25 at 2–3.

STCE, SPG, and CCM submitted an appeal of the termination to the DOE Senior Procurement Executive on September 23, 2016. STCE wrote, "We are not challenging the Department's decision to decline to provide additional time or funding for Phase I. We do, however, dispute that the Department may discontinue the parties' cooperative agreement based upon STCE's alleged failure to achieve the Phase 1 technical objectives." Pls.' Ex. 26 at 1. The parties contended that DOE's public criticism of the project fell

below the standard of normal federal stewardship and breached the implied duty of good faith and fair dealing, excusing STCE's failure to reach financial close. The parties also argued that the guarantors were not obligated to repay DOE under the terms of their payment agreements. The Senior Procurement Executive declined to review the appeal because whether DOE was under an implied duty of good faith and fair dealing or violated that duty were not issues arising from DOE's financial assistance regulation.

On December 22, 2016, DOE issued letters to STCE, SPG, and CCM, notifying each of its repayment obligation. DOE notified SPG and CCM that it had directed STCE to repay immediately. DOE notified SPG that it "is required to pay DOE up to $7.8 million" by repaying $1.8 million immediately upon receiving notice that STCE had failed to repay and $6 million in quarterly installments beginning January 1, 2017, if STCE failed to repay by that date. Pls.' Ex. 30. DOE notified CCM that it had to release the $6 million in the segregated deposit fund to DOE "within 30 days of the date of a final, non-appealable decision should STCE fail to satisfy its liability under the cooperative agreement." Pls.' Ex. 29. DOE has not followed those letters with any subsequent notice or unconditional demand for payment to SPG or CCM.

Plaintiffs do not allege that they have paid any portion of the $13.8 million or that SPG or CCM disputed the obligation to pay through administrative process at DOE after receiving the notification letters.

STCE, SPG, and CCM filed this action in August 2017, asking the court to find that DOE breached the cooperative agreement, excusing STCE's duty to reach financial close and thus precluding DOE from discontinuing the cooperative agreement for failure to meet technical objectives, and that SPG and CCM are not obligated to repay $13.8 million of accelerated payments. Defendant first moved to dismiss the complaint in October 2017. STCE filed for Chapter 7 bankruptcy in October 2017, however, and the bankruptcy trustee later exercised her authority to decline to move forward with the lawsuit. We thus granted plaintiffs' subsequent motion to amend their complaint to remove STCE as a plaintiff and denied the government's motion to dismiss as moot. SPG and CCM filed an amended complaint on May 1, 2018, seeking the same relief.

DISCUSSION

The government moved to dismiss the guarantors' amended complaint on May 21, 2018. Defendant argues that the guarantors have raised their arguments against repayment prematurely as a claim against the government rather than waiting for the government to seek repayment from them. Because they do not seek payment of money damages and because the cooperative agreement cannot be interpreted fairly to call for money damages in the event of breach of the implied duty of good faith and fair dealing, defendant argues that plaintiffs cannot establish subject-matter jurisdiction over either count in its complaint. Additionally, the government contends that SPG and CCM lack standing to sue for breach of the cooperative agreement because they are not parties to or third party beneficiaries of that agreement. Finally, the government argues that DOE's report to Congress and subsequent termination of the cooperative agreement were permissible under the terms of the cooperative agreement and thus plaintiffs fail to state a claim on which relief can be granted.[2]

In deciding a motion to dismiss for lack of subject-matter jurisdiction, Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), the court takes the undisputed facts alleged in the complaint as true and draws reasonable inferences in plaintiff's favor. *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011). Plaintiff bears the burden to establish this court's jurisdiction by a preponderance of evidence; its complaint must include "the facts essential to show jurisdiction." *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Trusted Integration, Inc.*, 659 F.3d at 1163. If defendant challenges the facts supporting jurisdiction, "we look to the true nature of the action in determining the existence or not of jurisdiction." *Katz v. Cisneros*, 16 F.3d 1204, 1207 (Fed. Cir. 1994). The court may consider material beyond the complaint to determine whether it has jurisdiction. *McNutt*, 298 U.S. at 189. If the court finds that it lacks subject-matter jurisdiction, it must dismiss the claim. RCFC 12(h)(3).

Plaintiffs allege that this court has jurisdiction over their claim under the Tucker Act, 28 U.S.C. § 1491(a)(1) (2012), which grants the court jurisdiction, in part, "to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States

---

[2] In light of our conclusion that we lack subject-matter jurisdiction over plaintiffs' claim, we do not reach the government's arguments on standing and failure to state a claim.

. . . ." This section of the Tucker Act establishes the court's subject-matter jurisdiction, but it is not a cause of action itself. Plaintiffs must base their claim on a substantive right to money damages arising from the Constitution, a statute, regulation, or contract with the United States. *United States v. Testan*, 424 U.S. 392, 398 (1976). Judicial gloss on the Tucker Act also makes it clear that jurisdiction does not extend to the issuance of declaratory judgments or to grants of equitable relief; rather plaintiffs must demonstrate their right to "actual, presently due money damages from the United States." *United States v. King*, 395 U.S. 1, 3 (1969).

Plaintiffs do not contend that they have a right to actual, presently due money from the United States. When DOE paid STCE $13.8 million, it did so as an acceleration of anticipated funding for later phases of the project. DOE agreed to pay STCE those funds because STCE provided DOE assurance that STCE or a guarantor would repay the money necessary to balance the cost share in accordance with the cooperative agreement. SPG and CCM only had an obligation to repay the accelerated funds if (1) STCE was obligated and failed to repay DOE *and* (2) a qualifying termination or discontinuation occurred under the terms of their payment agreements. DOE notified SPG and CCM of its position that, if STCE failed to repay the accelerated payments, SPG and CCM were liable to repay DOE. As of August 2018, however, DOE has taken no further action to seek repayment from the guarantors.

The guarantors ask this court to declare either that (1) the payment agreements do not require repayment under these circumstances or (2) that a material breach of a duty implied in the underlying cooperative agreement excused STCE's performance in Phase 1, thus precluding DOE from terminating the agreement based on failure to reach technical objectives and releasing the guarantors from an obligation to repay in STCE's stead. Either outcome results in purely declaratory relief: plaintiffs seek a finding that they owe no debt to DOE or, at the very least, a cancellation of any debt due to a breach by DOE. We agree with the government; on its face, this is not a money claim against United States.

Plaintiffs' claim is indistinguishable from *Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. United States*, where an immigration bond agency, Gonzales, sought cancellation of its debt to the Department of Homeland Security ("DHS"). 490 F.3d 940, 942 (Fed. Cir. 2007). The bonding agency had posted a number of bonds with DHS. If the bond conditions were substantially performed or circumstances obviated the need for the bond, DHS would cancel the bond, releasing Gonzales from liability to pay. If the bond's

conditions were substantially violated, however, DHS would declare the bond breached and Gonzales would be obligated to pay the amount of the bond. DHS found Gonzales had breached "almost 200 immigration bonds." *Id.* Rather than pay, Gonzales sued DHS for "'monetary damages, in the form of cancellation of debt,'" because DHS allegedly had breached a number of immigration bond contracts by failing to comply with the conditions therein. *Id.* (quoting Pl.'s Fourth Am. Compl. at 2).

The Federal Circuit vacated and remanded the district court's transfer of Gonzales' claim from the district court to the Court of Federal Claims, holding that "Gonzales's claims are not Tucker Act claims for monetary relief, and thus, the Court of Federal Claims lacks jurisdiction." *Id.* The Federal Circuit reasoned that cancellation of debt is not the equivalent of seeking money damages, because if Gonzales prevailed on the merits, "[n]o monies would be due Gonzales either in the form of cash or credit (such as an offset of other debt)." *Id.* at 945. Instead, Gonzales "would simply be relieved of any obligation to pay the government under the terms of the immigration bonds." *Id.* Because DHS did not have money that had to be paid or credited to Gonzales, the claim was outside this court's jurisdiction.

Plaintiffs distinguish *Gonzales* by arguing that the United States is a signatory to a contract with plaintiffs—the payment agreements—and thus that they are presumptively entitled to money damages as a form of relief for an alleged breach. Plaintiffs argue that the United States is constructively in possession of their money because the payment agreements obligated CCM to hold the guaranteed $6 million in a segregated deposit account and obligated SPG to make a portion of its commitment available for immediate payment, thus encumbering these funds.

We disagree. Segregation of funds to make them available for immediate payment is not the equivalent of the United States having possession of funds belonging to plaintiffs. These guarantors would be in the same position as the bond agency in *Gonzales* if they succeeded on the merits of their claim: DOE would not owe the guarantors money. Rather SPG and CCM would be free of any obligation to pay DOE or to encumber their funds for future payment. That result requires a declaration of rights only, not the return of monies.

It is true that the default remedy for breach of contract is money damages; however, not every breach of contract contemplates a money remedy. *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011). This

court and the Federal Circuit have held that particular cooperative agreements did not contemplate payment of money as a remedy for breach of the agreement. *E.g.*, *Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008) (a cooperative agreement with a mushroom waste recycling facility was not a procurement contract within the scope of the Contract Disputes Act, 41 U.S.C. §§ 7101–09 (2012), and did not provide a substantive right to recover money damages); *St. Bernard Parish v. United States*, 134 Fed. Cl. 730, 734–36 (2017) (holding that a cooperative agreement with a local government was not a contract with the United States and did not contemplate money damages as a form of relief); *cf. Moore v. United States*, 48 Fed. Cl. 394, 397 (2000) (noting that in cases involving cooperative agreements, this court has held that the agreement had the character of a contract and jurisdiction existed to consider whether the agreement was breached).

More importantly, however, even if plaintiffs are correct that the cooperative agreement is a contract to which they are parties, and even if the cooperative agreement contemplated damages for breach, plaintiffs do not seek such relief. They do not seek money damages as a result of breach of the implied duty of good faith and fair dealing. Instead, they seek a declaration that such breach excused STCE's failure to reach financial close and as a result DOE should be precluded from seeking repayment of the accelerated funds.

## CONCLUSION

Plaintiffs do not found their claim on a substantive right to actual, presently due money damages arising from their payment agreements. Instead, they only seek declaratory relief. This court therefore does not have jurisdiction over their claim. The government's motion to dismiss the amended complaint for lack of subject-matter jurisdiction is granted. The Clerk is directed to enter judgment for defendant. No costs.

s/Eric G. Bruggink
Eric G. Bruggink
Senior Judge
